ADAMS *v.* KEYSTONE MANUF'G CO. *et al.*

(*Circuit Court, N. D. Illinois.* February 5, 1890.)

1. PATENTS—CORN-SHELLERS—INFRINGEMENT.

Letters patent issued October 15, 1872, to Henry A. Adams, for an improvement in corn-shellers, consisting of the combination with the corn-sheller of a series of wings, wheels, or projections, so arranged on a shaft as to revolve in the direction in which the corn is running, and to force into the sheller all misplaced ears, are infringed by a device which substitutes for the round shaft with its projections a square shaft, so grooved as to make the four projecting corners do the same work as the projections on the other shaft.

2. SAME—ACCOUNTING—EVIDENCE.

In taking an account of profits made by the infringers of a patent, where the complainant shows what profits were made by manufacturers of the patented article, which is substantially the same as the infringing device, and the defendant offers no proof as to his actual profits, a finding that defendant's profit on each machine was the same as that of the other manufacturers is proper.

In Equity

Suit by Henry A. Adams against the Keystone Manufacturing Company and others for the infringement of a patent.

*Coburn & Thacher,* for complainant.

*Manahan & Ward,* for defendants.

BLODGETT, J.  An interlocutory decree was rendered in this case several months ago, finding that defendant the Keystone Manufacturing Company had infringed the first claim of the patent granted to complainant on the 15th of October, 1872, for an "improvement in corn-shellers," and a reference made to Henry W. Bishop, Esq., one of the masters of this court, to take proofs and state an accounting of the gains and profits received by defendant from such infringement, and also such damages as complainant may have sustained by reason thereof.  The master has filed his report, finding that the defendant company has manufactured and sold 688 two-hole shellers, 683 four-hole shellers, 236 six-hole shellers, which infringe complainant's patent; that the profits on the two-hole machines amounted to $10 on each machine, on the four-hole machines the profits amounted to $20 on each machine, and on the six-hole machines the profits amounted to $30 on each machine, making an aggregate profit on all the machines so made and sold of $27,620, for which amount he recommends that a decree be entered.  It also appears from the proof that, after the court had entered an order awarding the complainant an injunction *pendente lite,* unless the defendant would file a bond, with surety to be approved by the court, conditioned for the payment of such amount as the court might, on final hearing, award the complainant, the defendant, having filed such bond, changed the construction of its machine by substituting a fluted shaft, with four projecting corners or angles, in place of the picker shaft, or round shaft with pickers or projections, which defendant had before used.  This fluted shaft, the master finds, is the equivalent of the picker shaft before used, and the profits are awarded on machines with the fluted shaft the same as

on those of the older construction; it appearing from the proof that defendant has made machines with the fluted shaft, as follows: Two-hole machines, 603; four-hole machines, 205; six-hole machines, 182. To this report and findings of the master the defendant has filed exceptions, which have been fully argued, both orally and by briefs.

The first of these exceptions goes to the allowance of profits on machines containing the fluted shaft; defendant contending that this fluted shaft does not infringe the complainant's patent. The first claim of the patent is for the combination with the corn-sheller of a series of wings, wheels, or projections, so arranged on a shaft as to revolve in the same direction as the corn is running, and so placed relative to the throats as to force into the machines all misplaced or hesitating ears, substantially as specified. The specifications of the patent provide for placing this picker or beater shaft directly over the stream of ears of corn, just at the throat of the machine, or entrance into the shelling mechanism, so that the projections on the shaft will force or compel the ears to enter the shelling mechanism, and the patentee says in his specifications:

"Space enough is left between the revolving wings and the bottom of the throats to allow of a single ear to pass freely beneath without contact, but sufficiently near to strike an overriding ear, and force it, and other ears in contact therewith, or in the road thereof, ahead rapidly into the sheller, clearing the passage for the corn following. It is evident that the form or shape of the beaters or projections upon the revolving shaft may be varied in many ways, and the result accomplished. I therefore do not limit myself to the form shown."

By fluting or grooving this square shaft between the corners, defendant has manifestly made a shaft with "projections," which do just what the patentee intended the wings, wheels, or projections on his shaft should do,—that is, force into the machine all misplaced or hesitating ears,—and the angles or flanges made by the grooving is one of the many forms of projections on the shaft which the patentee suggests may be adopted. The proof also shows that some kind of a beater or picker shaft is absolutely essential to the operation of defendant's machine, and the substitution by defendant of this fluted shaft, in place of its old picker shaft,—that is, the shaft with pickers or projections upon it,—is a tacit admission by defendant of the necessity of this feature to its machine. I therefore find that the master committed no error in taking into his account the profits on these machines with the fluted shaft.

The second, third, and sixth exceptions insist that the master should have found the difference between the profits on the defendant's machine and what would have been the profits by the use of other well-known picker shafts in use prior to complainant's invention. It is a sufficient answer to these objections that the proof shows no beater or picker shafts in public use prior to the complainant's invention which would perform, or were intended to perform, the function of complainant's shaft, either in complainant's or the defendant's corn-shellers.

The fourth, fifth, seventh, and all the subsequent exceptions assigned may be considered together, and, in substance, insist that the master had

no basis in the proof for finding the amount of the defendant's profits as stated in his report. The proof shows that the manufacture of corn-shellers of the class to which defendant's machine belongs—that is, machines in which the ears of corn are fed endwise into the shelling mechanism—is confined to four concerns: The Sandwich Manufacturing Company, at Sandwich, Ill.; the Marseilles Manufacturing Company, at Marseilles, Ill.; the Joliet Manufacturing Company, at Joliet, Ill.; and the defendant company, at Sterling, Ill. The proof also showing that, as early as 1861, Augustus Adams, of Sandwich, Ill., took the first step in the invention and manufacture of power corn-shellers of this class, in which the corn was elevated by an endless apron or conveyer to a point much above the shelling mechanism, where it was delivered into a chute by which it slid, by force of gravity, into the throat of the machine, and into the shelling mechanism; but the assistance of a man or boy was needed to push forward the ears as they overrode, or crossed each other in the chute, and direct them into the throat of the machine. The device now before the court, covered by complainant's patent, was applied to this machine, and its effect, as the proof shows, was not only to dispense with the attendant at the throat of the machine, but to increase the shelling capacity of the machine about one-third; that is, the capacity of an 800-bushel machine per day was increased to 1,200 bushels per day. Then came the Schriffler invention, which dispensed with the chute, and delivered the corn directly into the shelling mechanism from the upper end of the conveyer; and afterwards came the chain conveyer, or the "Marseilles feed," covered by the patent to J. Q. & O. R. Adams; which, as the proof shows, are the three important improvements in this class of machines which have been made since the original Augustus Adams machine was brought out, the combined effect of which has been to increase the shelling capacity of the machine to the extent of a thousand bushels per day for the four-hole machine, that being the one in ordinary use. The defendant's machine differs from the Adams machines mainly in the shelling devices,—that is, in the mechanism for stripping the corn from the cob after the ears have passed into the throat of the machine,—and, as I have already said, the proof shows that, without the beater shaft, neither the defendant's nor the Adams sheller will operate effectively.

The defendant, as the proof shows, is the competitor of these Adams machines made by the Sandwich, Joliet, and Marseilles Companies. A glance at the mechanism of the two shellers—that is, the Adams and the defendant's—shows, even to a person who is not an expert, that there can be but very little, if any, substantial difference between the cost of the Adams machines and the defendant's of the same capacity, and the circulars introduced in evidence substantiate this conclusion. The complainant, to establish the extent of the defendant's profits, called witnesses familiar with the cost and selling price of the Sandwich, Joliet, and Marseilles machines, and showed what the profits of these manufacturers were on the different sizes of machines made by them, and what proportion of these profits were fairly attributable to the com-

plainant's device. No proofs were introduced by either party as to the actual profits realized by the defendant company, but it was evidently assumed by the master that the machines of the defendant were so near like those of these other companies in their material, form, and cost of construction that the profits of defendant on machines made and sold by it must have been substantially the same as the profits made by these other manufacturers. After this proof was furnished on behalf of the complainant, the defendant declined to put in any proof as to what its profits actually were; and I think the master was justified in assuming that the complainant's proof had made a sufficient case as to the extent of the defendant's profits. The machines are so nearly alike that the presumption fairly and naturally arises that each of them would furnish about the same measure of profits to the manufacturer. After the ground for this presumption had been laid by the complainant's proof, the defendant might have produced proof showing what its actual profits were, and insisted that those alone furnished the measure of the complainant's recovery; but the defendant saw fit to stand mute, and I do not think it can now complain of the master's conclusion. Here are competing manufacturers, making the same kind of machine, for the same market; and the natural conclusion is that they would pursue substantially the same business methods, and realize about the same profits. The case is quite analogous in the features under discussion to *Stephens* v. *Felt*, 2 Blatchf. 38. It is true the supreme court said in a recent case (*Rude* v. *Westcott*, 130 U. S. 152, 9 Sup. Ct. Rep. 463) that "actual damages must be calculated, not imagined, and an arithmetical calculation cannot be made without certain *data* on which to make it." But here the inquiry is as to the profits, and, when proof is adduced showing what profits one manufacturer makes on a machine, it furnishes something more than a mere imaginary basis for calculating what profits another manufacturer would make on the same kind of machine, especially in localities where there could be no substantial difference in the cost of labor or material. The witnesses produced by the complainant were experts as to the cost of making, and the profits realized from the manufacture, of machines substantially like defendant's; and their testimony, in the absence of any countervailing proof from the defendant, justifies, if it does not compel, the conclusion that these experts were right in their estimate of the defendant's profits, and the master's report shows that he took the lowest estimate of these experts as the basis of his findings. The exceptions are each and all of them overruled, and the master's report affirmed, and a decree may be entered for the amount of profits found by the report.